**JENNER & BLOCK LLP**
Navid C. Bayar (SBN 319640)
nbayar@jenner.com
525 Market Street, 29th Floor
San Francisco, CA 94105-2708
Telephone: (415) 293-4812

Susan J. Kohlmann (*pro hac vice application forthcoming*)
skohlmann@jenner.com
Alison Stein (*pro hac vice application forthcoming*)
astein@jenner.com
1155 Avenue of the Americas
New York, NY 10036-2711
Telephone: (212) 891-1690

**TORRIDON LAW PLLC**
Paul T. Cappuccio (*pro hac vice application forthcoming*)
pcappuccio@torridonlaw.com
Brett Katz (*pro hac vice application forthcoming*)
bkatz@torridonlaw.com
Justin M. Romeo (*pro hac vice application forthcoming*)
jromeo@torridonlaw.com
801 Seventeenth Street, N.W., Suite 1100
Washington, DC 20006
(202) 249-6900

*Attorneys for Defendants*
*News Corporation, Dow Jones, and NYP Holdings*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| BRAVE SOFTWARE, INC., | 4:26-cv-04758-JST |
| Plaintiff, | **ANSWER ON BEHALF OF NEWS CORPORATION, DOW JONES, AND NYP HOLDINGS AND COUNTERCLAIMS ON BEHALF OF DOW JONES AND NYP HOLDINGS** |
| v. | |
| NEWS CORPORATION d/b/a NEWS CORP, DOW JONES & CO., INC., NYP HOLDINGS, INC., NEWS CORP UK & IRELAND LIMITED, and NEWS PTY LIMITED d/b/a NEWS CORP AUSTRALIA, | **DEMAND FOR JURY TRIAL** |
| Defendants. | Judge: Jon S. Tigar<br>Action filed: May 19, 2026 |

**INTRODUCTION**

Dow Jones, NYP Holdings, and their parent News Corp are among the world's most recognized news publishers.[1] Their publications — including The Wall Street Journal and the New York Post, two of the most widely circulated newspapers in the United States — are built on the work of accomplished journalists, editors, and staff who investigate and write with skill, integrity, and purpose. These journalists work under difficult deadlines and unpredictable circumstances; some risk their lives and liberty by investigating, writing and breaking stories they believe will change the world. Editors and security specialists go to great lengths to try to ensure journalists' safety in extreme risk scenarios. Their stories are compelling, provocative, and enduring.

Uncovering the story is only the first step for a journalist. A journalist must also master the art of knowing which sources to rely on, when additional sourcing is needed to verify or challenge a claim, and what context the audience requires to fully understand the story's significance. Perhaps most importantly, the articles that journalists produce reflect their unique selection, curation, and expression of each story. A skilled journalist masters the craft of transforming raw, unverified facts into a corroborated story that captures attention, provokes thought, and engages the reader's imagination—the very qualities that distinguish enduring journalism from a mere recitation of events. That creative endeavor is what copyright protects, and it is precisely what artificial intelligence (hereinafter "AI") companies extract and reproduce when they ingest and replicate copyrighted news articles. Companies like Brave incorporated copyrighted works into their products and services to generate revenue for themselves, all while destroying the incentive for anyone to ever pay the very publishers who produced the content that Brave has monetized.

Demand for this high-quality, accurate, and up-to-date journalism has never been greater. The News Corp Companies monetize that demand primarily through digital subscriptions, online advertising generated by direct website traffic, and partnership agreements with third parties, including AI companies. Their content is a critical input for the emerging AI industry, and legitimate AI companies recognize this.

---

[1] Defendants News Corporation ("News Corp"), Dow Jones & Company, Inc. ("Dow Jones"), and NYP Holdings, Inc. ("NYP Holdings") are referred to together as "Defendants", or "News Corp Companies." Concurrently with the filing of this Answer and Counterclaims, defendants News Corp UK & Ireland Limited and News Pty Limited d/b/a News Corp Australia (collectively "Foreign Defendants") are moving to dismiss the complaint.

The News Corp Companies have entered into good-faith agreements with legitimate AI companies such as OpenAI and Meta, partners who respect the value of quality journalism and compensate publishers accordingly.

Brave's declaratory judgment action rests on a fundamental mischaracterization of the News Corp Companies' position. Brave claims that News Corp Companies' 2025 cease-and-desist letter to Brave targeted "Brave's core, traditional search engine product," challenging "the most basic function of a search engine—indexing publicly available content – [as] copyright infringement." (Compl. ¶ 5). But the News Corp Companies have never objected to lawful search engine activity. A lawful search engine operates transparently and synergistically: it crawls publicly-available content in a manner that enables website owners to block access if they so choose, stores that content in a searchable index, and delivers brief snippets – traditionally around 50 words – alongside links to the original source. It is a properly balanced tool of discovery designed with adequate guardrails to ensure it does not act as a tool of competitive substitution.

The Brave conduct about which the News Corp Companies have objected is very different from a lawful search engine. By its own public admission, Brave masks its web crawlers such that publishers cannot detect or reliably block them. Brave then bundles extra-long snippets of up to approximately 250 words (approximately 5 times traditional search snippets) and/or its so-called summarizer version of the content it copies and then sells that verbatim or near verbatim copied content to enterprise customers, primarily AI companies. Brave calls this its "Data for AI API" business; a more apt description is theft by a masked intruder. At least prior to March 2025, unlike traditional search, which directs users to publishers' websites, Brave has used copyrighted content that it has stolen from the News Corp Companies to do two things: sell that content to AI companies *in direct competition* with the News Corp Companies' own content licensing programs, and offer substitute versions of the News Corp Companies' articles as a data source for digital businesses wishing to merge off-the-shelf generative AI tools with a stream of reliable news articles.[2]

---

[2] *See generally Brave Search Crawler*, Brave.com (last visited July 21, 2026), https://search.brave.com/help/brave-search-crawler; Alex Ivanovs, *The Shady World of Brave Selling*

DEFENDANTS' ANSWER AND COUNTERCLAIMS
CASE NO. 4:26-cv-04758-JST

The News Corp Companies have never refused to license their copyrighted content, even to Brave, and refrained from filing suit despite Brave's ongoing copyright infringement. What the News Corp Companies did upon learning of Brave's flagrant theft and resale of their copyrighted journalism was to send a cease-and-desist letter demanding that Brave stop stealing and reselling its high value content.  It was Brave who responded by filing suit. And after the News Corp Companies believed they reached agreement, having spent (perhaps the better word is wasted) over a year negotiating a fair, market-based agreement with Brave, Brave walked away and unilaterally chose litigation a second time. Absent an agreement, the News Corp Companies will not stand idly by while Brave's obvious theft of high value news content goes unchecked.

The central question before this Court is straightforward: Does Brave's systematic and surreptitious copying of the News Corp Companies' copyrighted content and commercial resale of that content to third parties qualify as "fair use" under federal copyright law? It does not come close. Brave's copying and resale of the News Corp Companies' content is not transformative: Brave does not enhance, analyze or reimagine the content it steals. Brave has simply surreptitiously copied and resold the News Corp Companies' content to the same commercial companies to whom they can and do license their content, inserting itself as an unlicensed middleman between publishers and their existing and potential legitimate business partners, arrogating to itself commercial opportunities that fall squarely within the exclusive rights that belong to the News Corp Companies as copyright holders. If Brave's business model were deemed a fair use, it would profoundly damage the news gathering and publishing industry. Brave's Data for AI API products are not innovation but rather a substitutive scheme built off the backs of hardworking journalists and News Corp Companies' long-term commercial investments.

The fact that the News Corp Companies have not objected to Brave, or any other search engine, copying their copyrighted works for the limited purpose of operating a lawful search engine that assists users in finding those copyrighted works does not give Brave permission to resell that content to AI companies in direct competition with the News Corp Companies' own partnership programs. That is what

---

*Copyrighted Data for AI Training*, Stack Diary (July 16, 2023) https://stackdiary.com/brave-selling-copyrighted-data-for-ai-training/ (quoting Josep M. Pujol, Chief of Search, Brave).

DEFENDANTS' ANSWER AND COUNTERCLAIMS
CASE NO. 4:26-cv-04758-JST

this case is about — not the "traditional search engine" strawman at the center of Brave's complaint, but the wholesale theft and resale of copyrighted journalism in direct competition with the rightsholders who created it. Brave's unlawful scheme is precisely what copyright law is designed to prevent.

## ANSWER TO COMPLAINT

Defendants answer the allegations by Brave Software, Inc. ("Brave") in its Complaint as follows:

## PRELIMINARY STATEMENT

1. Defendants deny the allegations of Paragraph 1.

2. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 2 and affirmatively state that Brave's customers have used the News Corp Companies' content.

3. Defendants admit that certain entities connected with Defendants are engaged in publishing but otherwise deny the remaining allegations of Paragraph 3.

4. Paragraph 4 states legal conclusions to which no response is required. To the extent a response is required, Defendants state that the cited court opinions speak for themselves and otherwise deny the allegations of Paragraph 4.

## INTRODUCTION

5. To the extent Paragraph 5 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants deny the remaining allegations of Paragraph 5.

6. Defendants deny the allegations of Paragraph 6.

7. Defendants deny that their "approach" would disrupt the GenAI industry and otherwise lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 7.

8. To the extent Paragraph 8 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims

set forth below for Defendants' actual allegations against Brave. Defendants deny the remaining allegations of Paragraph 8.

9.    Defendants deny the allegations of Paragraph 9.

### NATURE OF THE ACTION

10.    Paragraph 10 states legal conclusions to which no response is required.

### THE PARTIES

11.    Defendants admit the allegations of Paragraph 11.

12.    Defendants admit the allegations of Paragraph 12.

13.    Defendants admit the allegations of Paragraph 13.

14.    Defendants admit the allegations of Paragraph 14.

15.    Defendants state that the allegations in Paragraph 15 concern entities that are separately moving to dismiss and therefore no response is required to these allegations.

16.    Defendants state that the allegations in Paragraph 16 concern entities that are separately moving to dismiss and therefore no response is required to these allegations.

17.    To the extent Paragraph 17 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants deny the remaining allegations of Paragraph 17.

### JURISDICTION AND VENUE

18.    Paragraph 18 states legal conclusions to which no response is required.

19.    Paragraph 19 states legal conclusions to which no response is required. To the extent Paragraph 19 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants deny the remaining allegations of Paragraph 19.

20.    To the extent Paragraph 20 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims

DEFENDANTS' ANSWER AND COUNTERCLAIMS
CASE NO. 4:26-cv-04758-JST

set forth below for Defendants' actual allegations against Brave. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 20.

21.     Paragraph 21 states legal conclusions regarding personal jurisdiction to which no response is required. Defendants admit that counsel for the News Corp Companies sent a letter dated February 27, 2025 to Brave's CEO at Brave's headquarters. To the extent Paragraph 21 purports to characterize that letter, the letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants admit that they conduct business in California, that Dow Jones maintains an office in San Francisco, and that News Corp has announced the launch of a new publication. Defendants deny that all of the copyrighted works at issue were created or published in California.

22.     Defendants admit that some portion of the events giving rise to the lawsuit occurred within this District, including Brave's management of the technology that Defendants contend infringes their intellectual property. To the extent Paragraph 22 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself.

23.     Defendants state that the allegations in Paragraph 23 concern entities that are separately moving to dismiss and therefore no response is required as to these allegations.

24.     Paragraph 24 states legal conclusions to which no response is required.

## FACTUAL BACKGROUND

### A.     Brave's Disruptive Search Engine

25.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 25.

26.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 26.

### 1.     Search Indexing

27.     Defendants admit on information and belief that search engine indexing is the process where a search engine browses the web and links with a designated crawler, discovers, copies, and analyzes website content, and then indexes or collects content and information to store in a central database (called an index) so that the search engine can retrieve and display relevant pages in search results when an

DEFENDANTS' ANSWER AND COUNTERCLAIMS
CASE NO. 4:26-cv-04758-JST

individual consumer queries for information. Defendants otherwise deny the truth of the remaining allegations of Paragraph 27. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave.

28.    Defendants admit on information and belief that Brave accesses and indexes websites that it does not own. Defendants otherwise lack sufficient knowledge to form a belief as to the truth of the rest of the allegations in Paragraph 28, and Defendants refer to their counterclaims for Defendants' actual allegations against Brave.

29.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 29. Defendants refer to their counterclaims for Defendants' actual allegations against Brave.

30.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 30 with respect to "any third-party webpage" but otherwise deny the allegations. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave.

**2.    Search Snippets**

31.    Defendants admit that Brave offers third-party content in its search results. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 31.

32.    Defendants admit on information and belief that snippet content is generated from the Brave Search Index, as well as through an AI model that analyzes pages and extracts snippets in response to the user's query. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations that Brave's use of snippets is similar to snippets offered by other search engines. Defendants deny the remaining allegations of Paragraph 32. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave.

### 3.    Search Summaries

33.    Defendants admit that Brave offers summaries that contain third party content but lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 33. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave.

34.    Defendants admit on information and belief that with respect to certain search engines, snippets provide a preview of third-party's webpages which may help users identify webpages they may want to visit, and in turn drive traffic to third party webpages and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 34. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave.

35.    Defendants admit on information and belief that certain Brave summaries were drawn on and link to third party websites and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 35. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave.

36.    To the extent Paragraph 36 purports to summarize the content of the annotated screenshot, the screenshot speaks for itself, and Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 36.

37.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 37. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave.

38.    To the extent Paragraph 38 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims below for Defendants' actual allegations against Brave. Defendants deny the remaining allegations of Paragraph 38.

39.    Defendants admit that they have advised Brave that its conduct violates their terms of service. To the extent Paragraph 39 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set

forth below for Defendants' actual allegations against Brave. Defendants deny the remaining allegations of Paragraph 39.

### B.    Brave Search API

40.    Defendants admit that they have advised Brave that its Search API infringes their copyrighted works. To the extent Paragraph 40 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants deny the remaining allegations of Paragraph 40.

41.    Defendants admit that Brave offers the products alleged in Paragraph 41 that can be used with LLMs. Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 41. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave.

42.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 42. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave.

43.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 43. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave.

44.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 44. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave.

45.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 45.

46.    Defendants admit that Brave offers search APIs to third-party GenAI companies for use with their LLMs but otherwise lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 46. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave.

DEFENDANTS' ANSWER AND COUNTERCLAIMS
CASE NO. 4:26-cv-04758-JST

47. Defendants admit that LLMs rely on Brave search results received through Brave's search API but otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 47. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave.

48. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 48.

**C.    Defendants' Threats and Demands**

49. Defendants admit that counsel for the News Corp Companies sent a letter dated February 27, 2025 to Brave's CEO at Brave's headquarters. To the extent that paragraph 49 purports to describe the February 27, 2025 letter, the letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants deny the remaining allegations of Paragraph 49.

50. To the extent that paragraph 50 purports to describe the February 27, 2025 letter, the letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants affirmatively state that Brave has used the News Corp Companies' content unlawfully and without authorization. Defendants deny the remaining allegations of Paragraph 50.

51. Defendants admit that they have alleged that Brave unlawfully scraped copyrighted News Corp Companies' content, and counsel for the News Corp Companies sent a letter dated February 27, 2025 to Brave's CEO at Brave's headquarters. To the extent that paragraph 51 purports to describe the February 27, 2025 letter, the letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants deny the remaining allegations of Paragraph 51.

52. Defendants admit they have advised Brave that it has unlawfully used significant portions of News Corp Companies' content in its Summarizer tool which is deliberately designed to siphon away traffic (along with attendant advertising, subscription and licensing revenues), and that counsel for the News Corp Companies sent a letter dated February 27, 2025 to Brave's CEO at Brave's headquarters. To

the extent that paragraph 52 purports to describe the February 27, 2025 letter, the letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants deny the remaining allegations of Paragraph 52.

53. Defendants admit that they have advised Brave that Brave's "Extra-alternate Snippets" were comprised of verbatim sentences and paragraphs of news articles, totaling hundreds of words and that Brave's use of Defendants' content is unlawful. To the extent Paragraph 53 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants deny the remaining allegations of Paragraph 53.

54. To the extent Paragraph 54 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants deny the remaining allegations of Paragraph 54.

55. To the extent Paragraph 55 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants deny the remaining allegations of Paragraph 55.

56. To the extent that paragraph 56 purports to describe the February 27, 2025 letter, the letter is attached as Exhibit A to the Complaint and speaks for itself.

57. To the extent Paragraph 57 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants deny the remaining allegations of Paragraph 57.

58. To the extent Paragraph 58 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants deny the remaining allegations of Paragraph 58.

59. Defendants deny the allegations of Paragraph 59.

**1.    Fair Use**

60. Paragraph 60 states legal conclusions to which no response is required. Defendants otherwise deny the remaining allegations of Paragraph 60.

61. Defendants deny the allegations of Paragraph 61.

62. Paragraph 62 states legal conclusions to which no response is required. Defendants otherwise deny the remaining allegations of Paragraph 62.

**2.    No Breach of Contract**

63. Paragraph 63 states a legal conclusion to which no response is required and Defendants otherwise deny the remaining allegations of Paragraph 63.

64. To the extent Paragraph 64 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Paragraph 64 states legal conclusions to which no response is required. Defendants otherwise deny the remaining allegations of Paragraph 64.

**3.    Copyright Misuse**

65. Paragraph 65 states legal conclusions to which no response is required. Defendants otherwise deny the remaining allegations of Paragraph 65.

66. To the extent Paragraph 66 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants deny the allegations of Paragraph 66.

67. To the extent Paragraph 67 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants deny the allegations of Paragraph 67.

68. To the extent Paragraph 68 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims

set forth below for Defendants' actual allegations against Brave. Defendants deny the allegations of Paragraph 68.

69. To the extent Paragraph 69 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants deny the allegations of Paragraph 69.

**D.     Brave Reacts to Defendants' Threats and Demands**

70. Defendants admit that Brave previously filed a declaratory judgment action against Defendants in this district but Defendants deny that Brave was entitled to any such relief and deny any remaining allegations of Paragraph 70.

71. Defendants admit that they communicated with Brave prior to this lawsuit but state that the correspondence exchanged as part of that communication speaks for itself. Defendants deny the remaining allegations of Paragraph 71.

72. Defendants admit that the parties exchanged communications but state that those communications speak for themselves.

73. Defendants admit that the parties filed a joint stipulation of voluntary dismissal in June 2025. Defendants otherwise deny the remaining allegations of Paragraph 73.

74. Defendants admit that the parties have not resolved their dispute and refer to the counterclaims following this Answer. Defendants otherwise deny the remaining allegations of Paragraph 74.

75. Defendants lack knowledge or information sufficient to form a belief as to why Brave filed this lawsuit and otherwise deny the allegations of Paragraph 75.

**FIRST CLAIM FOR RELIEF**

**(Declaratory Judgment of Non-Infringement)**

76. Defendants repeat and incorporate their responses to the preceding paragraphs as if fully set forth herein.

DEFENDANTS' ANSWER AND COUNTERCLAIMS
CASE NO. 4:26-cv-04758-JST

77.     To the extent Paragraph 77 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants deny the remaining allegations of Paragraph 77.

78.     To the extent Paragraph 78 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants deny the remaining allegations of Paragraph 78.

79.     Paragraph 79 states legal conclusions to which no response is required. Defendants otherwise deny the allegations of Paragraph 79.

80.     Defendants deny the allegations of Paragraph 80. To the extent Paragraph 80 purports to characterize the February 27, 2025 letter, the letter speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave.

81.     Paragraph 81 states legal conclusions to which no response is required. To the extent the remaining allegations of Paragraph 81 purport to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants deny the remaining allegations of Paragraph 81.

82.     Paragraph 82 states legal conclusions to which no response is required. To the extent the remaining allegations of Paragraph 82 purport to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave.

83.     Defendants admit that Brave seeks declaratory judgment but deny that Brave is entitled to any such relief.

84.     Defendants admit that Brave seeks declaratory judgment but deny that Brave is entitled to any such relief. To the extent the remaining allegations of Paragraph 84 purport to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself.

Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants otherwise deny the allegations of Paragraph 84.

85.    Paragraph 85 states legal conclusions to which no response is required. Defendants otherwise deny the allegations of Paragraph 85.

86.    Paragraph 86 states legal conclusions to which no response is required. Defendants otherwise deny the allegations of Paragraph 86.

## SECOND CLAIM FOR RELIEF

### (Declaratory Judgment of Copyright Misuse)

87.    Defendants repeat and incorporate their responses to the preceding paragraphs as if fully set forth herein.

88.    To the extent Paragraph 88 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants deny the remaining allegations of Paragraph 88.

89.    Paragraph 89 states legal conclusions to which no response is required. Defendants deny the remaining allegations of Paragraph 89.

90.    Defendants deny the allegations of Paragraph 90.

91.    Defendants deny the allegations of Paragraph 91.

92.    Defendants deny the allegations of Paragraph 92.

93.    Paragraph 93 states legal conclusions to which no response is required. Defendants deny the remaining allegations of Paragraph 93.

94.    Paragraph 94 states legal conclusions to which no response is required. Defendants deny the remaining allegations of Paragraph 94.

95.    Defendants admit that Brave seeks the declaratory judgment described in Paragraph 95. Defendants deny that Brave is entitled to any such relief and deny any remaining allegations of Paragraph 95.

96.     Paragraph 96 states legal conclusions to which no response is required. Defendants deny the remaining allegations of Paragraph 96.

97.     Paragraph 97 states legal conclusions to which no response is required. Defendants deny the remaining allegations of Paragraph 97.

**THIRD CLAIM FOR RELIEF**

**(Declaratory Judgment of No Breach of Contract – Terms of Service)**

98.     Defendants repeat and incorporate their responses to the preceding paragraphs as if fully set forth herein.

99.     To the extent Paragraph 99 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Defendants deny the remaining allegations of Paragraph 99.

100.    To the extent Paragraph 100 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Paragraph 100 states legal conclusions to which no response is required. Defendants deny the remaining allegations of Paragraph 100.

101.    To the extent Paragraph 101 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Paragraph 101 states legal conclusions to which no response is required. Defendants deny the remaining allegations of Paragraph 101.

102.    To the extent Paragraph 102 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Paragraph 102 states legal conclusions to which no response is required. Defendants deny the remaining allegations of Paragraph 102.

103.    To the extent Paragraph 103 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the

counterclaims set forth below for Defendants' actual allegations against Brave. Paragraph 103 states legal conclusions to which no response is required. Defendants deny the remaining allegations of Paragraph 103.

104.    To the extent Paragraph 104 purports to summarize the letter sent on February 27, 2025, that letter is attached as Exhibit A to the Complaint and speaks for itself. Defendants refer to the counterclaims set forth below for Defendants' actual allegations against Brave. Paragraph 104 otherwise states legal conclusions to which no response is required.

105.    Defendants admit that Brave seeks the declaratory judgment described in Paragraph 105. Defendants deny that Brave is entitled to any such relief and deny any remaining allegations of Paragraph 105.

106.    Paragraph 106 states legal conclusions to which no response is required. Defendants deny that Brave is entitled to any such relief and deny any remaining allegations of Paragraph 106.

### PRAYER FOR RELIEF

Defendants deny that Brave is entitled to judgment on any cause of action or relief in any form.

### JURY DEMAND

Defendants seek a jury trial on all issues qualifying for one in this action.

### AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which declaratory relief can be granted. Plaintiff has not pleaded facts sufficient to establish a plausible entitlement to a declaration with respect to the claims at issue.

### SECOND AFFIRMATIVE DEFENSE

The Complaint was premature at the time of filing.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff cannot establish any entitlement to costs or attorneys' fees under 17 U.S.C. § 505.

### FOURTH AFFIRMATIVE DEFENSE

Defendants reserve the right to supplement or amend this Answer and reserve all defenses available under Rule 8(c) of the Federal Rules of Civil Procedure, the Copyright Laws of the United States, and any

other defenses at law or in equity that become applicable during the course of discovery or otherwise in the course of this litigation.

DEFENDANTS' ANSWER AND COUNTERCLAIMS
CASE NO. 4:26-cv-04758-JST

**DOW JONES' AND NYP HOLDINGS' COUNTERCLAIMS**

**NATURE OF THE ACTION**

Dow Jones and NYP Holdings (together "Counterclaimants") repeat and reallege the Introduction to this pleading as if set forth in full. These counterclaims assert copyright infringement against Brave under the federal Copyright Act in connection with Brave's business-to-business (hereinafter "B2B") "Data for AI API" products built on Counterclaimants' copyrighted journalism. Despite Brave's attempt to frame this case as an attack on lawful search, the real issue is Brave's covert operation that masks its web crawlers, copies multiple verbatim excerpts from the same article, and resells that content to AI companies in direct competition with Counterclaimants' own partnership programs. The copyright infringement claims concern Brave's unauthorized copying at the input stage — its covert scraping of Counterclaimants' websites without identifying itself and without authorization, and its use of that scraped copyrighted content as inputs into its databases, indices, and search infrastructure in order to produce commercial products (e.g., its search and data API products) — as well as Brave's infringing conduct at the output stage, through which that copied content is reproduced, repackaged, and distributed to commercial customers. The claims address this input-and-output infringement as it relates to Brave's B2B Search API, which Brave licenses and sells to third parties, including at least until March 2025 through its "Extra-alternate Snippets" and "Summarizer" outputs delivered to AI companies and other commercial customers in competition with Counterclaimants' own partnership opportunities. In sum, Brave infringes Counterclaimants' registered copyrights in The Wall Street Journal and New York Post and its conduct falls nowhere near the bounds of fair use.

**PARTIES**

1.      Counterclaimant Dow Jones & Company, Inc. is a Delaware corporation with its headquarters and principal place of business in New York, New York 10036.

2.      Counterclaimant NYP Holdings, Inc. is a Delaware corporation with its headquarters and principal place of business at 1211 Avenue of the Americas, New York, New York 10036.

3.      On information and belief, Counterclaim Defendant Brave Software, Inc., is a Delaware corporation with a principal place of business in San Francisco.

DEFENDANTS' ANSWER AND COUNTERCLAIMS
CASE NO. 4:26-cv-04758-JST

**JURISDICTION AND VENUE**

4.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and § 1338(a) as the case concerns allegations of federal copyright infringement against Brave. These counterclaims seek damages, injunctive relief, and other equitable relief under the Copyright Act of 1976, 17 U.S.C. § 101 et seq.

5.     This Court has personal jurisdiction over Brave because it submitted to this Court's jurisdiction by filing its complaint. Moreover, Brave's principal place of business is in this district.

6.     Venue is proper in this District because Brave filed its complaint in this Court and resides in this District.

**GENERAL ALLEGATIONS**

**COUNTERCLAIMANTS' ROBUST BUSINESS AND COPYRIGHTED WORKS**

7.     Dow Jones began in 1882 as a niche news agency in a Wall Street basement, founded by reporters Charles Dow, Edward Jones, and Charles Bergstresser. Publishing the first edition of The Wall Street Journal in July 1889, Dow Jones has now expanded into a worldwide news powerhouse. It creates and distributes some of the most widely recognized and reputable publications in the news industry, including, in addition to The Wall Street Journal, Dow Jones Newswires, MarketWatch, Financial News, and Barron's.

8.     Dow Jones is a trusted source of accurate, original news stories, data and analytics, and financial and business insight for millions of customers across the country and around the world.

9.     A recipient of 39 Pulitzer Prizes, the award-winning newsroom at The Wall Street Journal sent one of the first news reports of a plane crashing into the World Trade Center on September 11, 2001, broke the story of fraud and corruption at Theranos which led to criminal prosecutions and convictions, uncovered thousands of federal officials having investments in companies that stood to benefit from their agencies' work, and first revealed a social media company's failure to take remedial measures despite internal knowledge of its platforms' ill effects on minors.

10.     Dow Jones owns copyrighted content in The Wall Street Journal, and registers copyrights with the United States Copyright Office for The Wall Street Journal. Upon information and belief, Dow

Jones's registered copyrighted works that Brave has accessed electronically and copied and/or reproduced, including the content covered by the registrations, are listed at Appendix A and Appendix C.

11.     NYP Holdings is the parent company of the New York Post, a trusted major news source for millions of readers and ranking last year as the third largest newspaper by print circulation in the United States. The paper was first published in 1801 by Alexander Hamilton. It is America's oldest continuously published newspaper and has one of the most visited news websites in the country.

12.     NYP Holdings owns copyrighted content in the New York Post, and registers copyrights with the United States Copyright Office for the New York Post. Upon information and belief, NYP Holdings' registered copyrighted works that Brave has been able to access electronically have been copied and/or reproduced by Brave, including the content covered by the registrations listed at Appendix B and Appendix D.

13.     Dow Jones, NYP Holdings, and their parent News Corporation are among the world's most recognized news publishers. Their publications — including The Wall Street Journal and the New York Post, two of the most widely circulated newspapers in the United States — are built on the work of accomplished journalists, editors, and staff who investigate and write with skill, integrity, and purpose. These journalists work under difficult deadlines and unpredictable circumstances; some risk their lives and liberty by investigating, writing and breaking stories they believe will change the world. Editors and security specialists go to great lengths to try to ensure journalists' safety in extreme risk scenarios. Their stories are compelling, provocative, and enduring. Uncovering the story is only the first step for a journalist. A journalist must also master the art of knowing which sources to rely on, when additional sourcing is needed to verify or challenge a claim, and what context the audience requires to fully understand the significance of the story. Journalists and their editors must have the judgment to recognize when a story is not yet ready to be published. Crucially, the way in which facts are characterized in the opening paragraph or "lede" of a story is a specific craft, allowing journalists to inject the appropriate degree of certainty or doubt around a specific fact or set of facts. Journalists and their editors go to great lengths to ensure that competing viewpoints are adequately represented.

14. And finally, the journalist must master the art of writing that story in a way that captures attention, spurs thinking, and provokes the imagination; this is what separates great journalism from a mere recitation of events.

15. Providing comprehensive, compelling news coverage, analysis, and opinion requires the immense innovation and creativity of many contributors. Before pen touches paper or fingers are placed on a keyboard, journalists at Dow Jones and NYP Holdings embark on a process shaped not just by the facts on the ground but by creative decisions about what kind of story to tell. For many stories, journalists at Dow Jones and NYP Holdings doggedly report the facts by relying on a network of sources developed over years if not decades. Even straightforward stories pegged to official statements or public utterances must account for the reliability of those sources and the need for additional reporting. Journalists must decide not only what stories to tell but how to tell them, making creative choices about what material should be included or emphasized, how a story should be organized and framed, and in what style or voice the story should be presented. A huge amount of work goes into writing the "lede" of the story; indeed, when deciding whether to commission a story often involves editors asking reporters: "What's the lede?" Being able to answer that question declaratively can make the difference between whether a story is published or not.

16. Journalistic writing often requires significant ingenuity as journalists must present compelling narratives to audiences within the confines of truth. Journalists and editors are laser-focused on engaging readers and audiences. Newsrooms like those operated by Dow Jones and NYP Holdings increasingly employ large teams of specialists charged with parsing reams of sophisticated, proprietary audience data and tailoring the product to the audience's need. There is, after all, no point uncovering and publishing important stories if no one reads them. The success and survival of news publishers depend just as heavily on which stories they choose to uncover and tell as on how they tell those stories.

17. News publishing — from breaking daily news to long-term investigations — also has a significant financial cost and risk. News publishers like Dow Jones and NYP Holdings employ journalists, subject-matter experts, photographers, videographers, video story tellers, statisticians, graphic designers, editors, and administrative staff. They maintain extensive equipment and offices, including global

networks of correspondents and bureaus, to cover events around the world. And stories require a multilayered editing process to ensure standards of quality and reliability, which further adds to the cost of creation.

18.     The cost of journalism is also much more than financial. Journalists may risk their lives and liberty in furtherance of their commitment to an informed public. They report from war zones, investigate terror networks, and report on major natural disasters. They risk arrest, incarceration, and wrongful prosecution, and sometimes even tragically lose their lives. Although safety can never be guaranteed, editors and security specialists go to great lengths to assess extreme risks and are constantly asking whether a story or reporting target is worth taking a particular risk or set of risks.

19.      News publishers can support their journalists' work and invest skill, creativity, time, and money into the important endeavor of gathering and presenting the news only if there is a market that fairly compensates them for these efforts.

20.     Before widespread internet access, news publishers funded their operations entirely from subscriptions, newsstand sales, and advertisements in their printed newspapers. But the economics of newsgathering have significantly changed in the past quarter-century, with many news companies downsizing or ceasing production of print editions altogether. Most now rely overwhelmingly on digital content, including paid access to copyrighted content and content supported by advertising revenue. Those revenues depend on consumers subscribing to the publications and, in the case of advertising-supported content, clicking on the links to the publisher's own webpages and to licensed webpages. When someone like Brave takes that content without a license and resells it at a profit, it is not just a legal violation — it is an assault on the economic foundation that makes quality journalism possible.

21.     Dow Jones and NYP Holdings are part of an expanding market for providing copyrighted journalism to AI companies, a market that currently generates substantial, quantifiable revenue. News Corp's multi-year partnership deals to provide its archived and current content to OpenAI and Meta are just two examples. Other major publishers — including Condé Nast, Axel Springer, and the Financial Times — have struck comparable agreements with OpenAI, while Reuters partnered to provide content to

Meta and the Associated Press similarly partnered with Google, confirming that a market for this content exists across the AI industry generally, not just as to any single publisher or platform.

22. This active partnership market is legally significant for the fair-use analysis, as the existence of this market defeats any contention that AI companies' unlicensed use of copyrighted journalism causes no cognizable market harm. Where, as here, a robust, thriving market for exactly the use at issue already exists — and where numerous AI companies have chosen to participate in that market rather than take content without authorization — Brave's decision to bypass licensing altogether cannot be excused as fair use or otherwise lawful; it is instead a blatant attempt to avoid paying for something the market has already shown has ascertainable, negotiated value.

23. Counterclaimants' content is highly valued in this burgeoning market.

## BRAVE'S HISTORY OF SIPHONING REVENUES FROM PUBLISHERS

24. Brave's decade-long history follows a consistent pattern: failed attempts at legitimate competition, followed by illegal business models built on the exploitation of news and other content publishers. Within a year of launching its own internet browser in 2015, Brave revealed this pattern for the first time. In January 2016, Brave released a browser with "ad-blocking" software that was, in fact, part of an ad-substitution scheme. Brave announced it would strip publishers' paid advertising from their websites entirely and replace it with advertising that Brave itself would sell, keeping 15% of the resulting revenue, sharing another 15% with its own advertising partners, and offering publishers and users the remainder in Bitcoin micropayments they had never agreed to accept.[3]

25. Brave marketed this scheme by wrapping itself in the flag of user privacy and positioning itself as a scrappy underdog taking on Big Tech. But stripped of its self-serving rhetoric, the business model was straightforward and strikingly similar to Brave's conduct at issue here: unilaterally seize publishers' assets, generate revenue from them, and return publishers nothing or a pittance in exchange.

26. On April 7, 2016, seventeen of the Nation's leading newspaper publishers, collectively representing more than 1,200 newspapers, responded with a joint cease-and-desist letter to Brave's founder

---

[3] Lara O'Reilly, *'Blatantly Illegal': 17 Newspapers Slam Ex-Mozilla CEO's New Ad-blocking Browser*, BUSINESS INSIDER (Apr. 7, 2016), https://www.businessinsider.com/newspaper-publishers-send-cease-and-desist-to-brave-browser-2016-4.

and CEO, Brendan Eich.[4] The signatories included The New York Times Company, The Washington Post, Dow Jones & Company, Inc., Gannett Co., Inc., Tribune Publishing Company, and other major publishers. The letter made plain what the publishers thought of Brave's plan: "Your plan to use our content to sell your advertising is indistinguishable from a plan to steal our content to publish on your own website." The publishers noted that their industry spends more than $5 billion per year on reporting in the United States alone, and that Brave's proposed Bitcoin "donations" and unspecified revenue sharing "cannot begin to compensate us for the loss of our ability to fund our work by displaying our own advertising." In short, the Nation's most important publishers collectively told Brave — in no uncertain terms — that what it was doing was wrong, that its proposed remedies were inadequate, and that they wanted no part of it. On information and belief, in response, Brave no longer operates its ad-replacement scheme.

## BRAVE LAUNCHES ITS TRADITIONAL SEARCH ENGINE PRODUCT

27. Brave did not build its search engine from scratch. In 2021, it acquired a company called Tailcat and repackaged Tailcat's technology as "Brave Search," which it released publicly in June 2022 after a year-long beta period.[5]

28. At launch, Brave Search appeared to function as a traditional search engine (save for the lack of crawler transparency): it indexed available web content and returned a list of links to publishers' websites in response to user queries often including short snippets of content that contained the search term entered by the user. In this form, Brave's search product was a tool of discovery, one that directed users to publishers' websites like those of the News Corp Companies, where they could read articles and generate advertising and subscription revenue for the publishers. The News Corp Companies did not object. But that legitimate business model did not last long.

---

[4] Letter from News Media Alliance publishers to Brendan Eich, Founder, President, and CEO, Brave Software, Inc. (Apr. 7, 2016), https://www.newsmediaalliance.org/wp-content/uploads/2016/08/Brave-Cease-and-Desist-Final-copy.pdf.

[5] *See* Brave, *Brave Search Beta Now Available in Brave Browser, Offering Users the First Independent Privacy Search/Browser Alternative to Big Tech*, Brave: Blog (June 22, 2021), https://brave.com/blog/brave-search-beta/; Brave, *Brave Search Passes 2.5 Billion Queries in its First Year, and Debuts Goggles Feature That Allows Users to Choose Their Own Search Rankings*, Brave: Blog (Jun. 22, 2021), https://brave.com/blog/search-anniversary/.

DEFENDANTS' ANSWER AND COUNTERCLAIMS
CASE NO. 4:26-cv-04758-JST

## BRAVE'S 2023 PIVOT FROM SEARCH ENGINE TO CONTENT RESELLER THROUGH ITS SEARCH API BUSINESS

29.     In May 2023, Brave launched its Search API, a paid product that sells access to copied content in Brave's search index to business customers, including generative artificial intelligence companies. In contrast to Brave Search available to ordinary end users, the Brave Search API offering is designed to plug into the software products of other businesses, providing them up-to-date web content based on the client's search parameters. Notably, Brave advertised that its API offers "extensive coverage of recent events around the world," that is, breaking news coverage produced by publishers such as the News Corp Companies.

30.     At the time Counterclaimants sent their February 2025 cease and desist letter, Brave's Search API was offered in multiple tiers (screenshot below). The first tier that Brave itself labeled "Data for Search" sold, among other things, traditional snippets of copyrighted works:



DEFENDANTS' ANSWER AND COUNTERCLAIMS
CASE NO. 4:26-cv-04758-JST

31. Brave's second, more expensive "Data for AI" API tier offered "Extra-alternate Snippets" and "Summarizer" (screenshot below). On information and belief, this offering continues today.



32. At least prior to March 2025, Brave's "Extra-alternate Snippets" ranged from approximately 150 to 260 words of verbatim text copied from the publisher's articles. Moreover, Brave's Data for AI API returned up to five such snippets for each search result. Brave alone decided how much of the publisher's article to include in each snippet delivered to its paying customers.

33. With respect to Brave's Summarizer product, Brave described it as a tool to provide "concise and to-the-point answers at the top of Brave Search results pages, in response to the user's input, solely based on Web search results[.] Using Web results the Summarizer provides real-time information that is up to date with today's events. Besides the summary itself, [Brave's] AI models are also able to replace the already query-dependent snippets (result descriptions) with a summarized version of those snippets, highlighting the answer when possible. This can be viewed as a summary of a single source (such as a press article), as opposed to the main summary where multiple sources are considered and aggregated to create a more comprehensive answer. The summary at the top of the results page and these special descriptions co-occur, so users will see the overarching summary as well as snippets with highlighted

answers."[6]   Upon information and belief, Brave's summarizer product operates similarly in both the consumer and enterprise services contexts.

34.    At its core then, Summarizer is based on retrieval-augmented generation (hereinafter "RAG"). Its step-by-step process starts with the user making a query. The system then queries a search index to get relevant web search results. These search results are then passed to a LLM as context, along with the user's original query and the LLM provides an answer to the user's query using this additional relevant context.

[6] Brave, *Brave Search Introduces the Summarizer, an AI Tool for Synthesized, Relevant Results,* Brave: Blog (Mar. 2, 2023), https://brave.com/blog/ai-summarizer/.

DEFENDANTS' ANSWER AND COUNTERCLAIMS
CASE NO. 4:26-cv-04758-JST

35.    Upon information and belief, at least prior to March 2025, the scope of Brave's copying and sale of copyrighted content is demonstrated by its own Data for AI API output. By way of example, with minimal changes, Brave's Data for AI API reproduced an entire verbatim article from the New York Post.

```python
query_summarizer("Output this article verbatim: https://nypost.com/2025/01/04/lifestyle/
joe-biden-to-award-ralph-lauren-presidential-medal-of-freedom/")
```

Ralph Lauren has made history as the first fashion designer to ever receive the Presidential Medal of Freedom. The style icon, 85, was presented the award — the nation's highest civilian honor — by President Biden, 82, in Washington on Saturday afternoon.

"America is my country — my home and its history, traditions and values have always been an inspiration," Lauren told The Post.

"To receive the Presidential Medal of Freedom conferred personally by the President of the United States is an honor of a lifetime. As a proud American citizen, I accept it with gratitude and great humility," Lauren added.

The NYC native was one of 19 recipients awarded the medal at Saturday's ceremony, with Anna Wintour, Hillary Clinton and Michael J. Fox among the other notable names honored.

Lauren was chosen by Biden for his "extraordinary contributions as a visionary designer, trailblazing entrepreneur, innovative business leader, and dedicated philanthropist."

Lauren's clothes have long been loved and worn by President Biden and First Lady Jill, 73, who notably attended the designer's Spring 2025 New York Fashion Week show in The Hamptons last September.

Lauren, born Ralph Lipschitz, grew up in The Bronx before launching an eponymous line of ties in the mid-1960s. From there, the visionary designer began creating clothing for both men and women, transforming the way America dressed.

Signature garments such as the Polo shirt and Ralph Lauren bear sweater have become staples of the American wardrobe. The designer has also dressed some of the country's most powerful people, including politicians, princesses, celebrities, and even the US Olympic team.

But Lauren has been selling more than just clothes. By combining East Coast prep with the cowboy cool of the West, he's also been selling an aspirational idea of America itself.

"I don't design clothes, I design dreams," the avowed movie lover once declared.

"Through his cinematic advertising, and the intricate beauty of his stores and restaurants, Lauren has redefined American style," the rep for the Ralph Lauren Corporation stated.

Over the decades, the Ralph Lauren brand has expanded beyond apparel, selling accessories, fragrances and home decor — making the designer one of the wealthiest men in the biz. Lauren has amassed a personal net worth of $10.8 billion, according to Forbes, while the Ralph Lauren Corporation brought in $6.63 billion in revenue last year.

Lauren has become a prominent philanthropist, with his Ralph Lauren Corporation Foundation donating tens of millions of dollars to various causes since its establishment in 2001. Among the issues close to Lauren's heart: cancer care and prevention and environmental advocacy.

DEFENDANTS' ANSWER AND COUNTERCLAIMS
CASE NO. 4:26-cv-04758-JST

36.     Upon information and belief, Brave stored full copies of Counterclaimants' article pages so that Brave could return whichever extra-long snippets or Summarizer versions it unilaterally chose in response to client queries to the Data for AI API.

37.     At least prior to March 2025, Brave's Data for AI API returned approximately 215 words of verbatim text from a single New York Post article, approximately 140 words of verbatim text from a single Barron's article, and approximately 120 words of verbatim text from a single Wall Street Journal article. Multiple paragraphs of other publishers' articles were likewise returned through the API. These are not isolated examples. They are the ordinary output of Brave's Data for AI product, sold at scale to paying customers.

38.     Upon information and belief, prior to February 27, 2025, among Brave's Data for AI API customers were generative AI companies such as Perplexity,[7] Cohere, and Mistral, which could obtain copies of Counterclaimants' copyrighted content through Brave to power their own AI products while compensating only Brave and not Counterclaimants.



_____

[7] Dow Jones and NYP Holdings are separately engaged in litigation with Perplexity AI regarding Perplexity's own infringement of copyrighted articles from *The Wall Street Journal* and the *New York Post*, respectively. *Dow Jones & Co., Inc., et al. v. Perplexity AI, Inc.*, No. 1:24-cv-07984 (S.D.N.Y. filed Oct. 21, 2024).

39.     Today, Brave delivers the copyrighted content of the New York Times and the Washington Post through its AI Answers (formerly Summarizer) product and the "Extra-alternate Snippets."

40.     Brave did not advertise to its customers that it is selling the text of copyrighted news articles. Instead, it relied on sanitized terminology: "Extra-alternate Snippets," offered with "[r]ights to use data for AI inference" and, for premium customers, "storage rights" permitting them to "[c]ache/store data to train AI models." But these euphemisms cannot obscure what Brave is selling. The "data" is the copyrighted journalism of publishers like the News Corp Companies. The "Extra-alternate Snippets" are large verbatim excerpts of Counterclaimants' copyrighted articles. And the "rights" that Brave purports to grant are rights that Brave does not own and has no authority to convey.

41.     When confronted by a journalist in July 2023 about the sale of copyrighted content through its API, Brave's Chief of Search, Josep Pujol, responded that the rights being sold were "not rights to content, copyrighted or not," but rather rights to "the output of the API request," and that Brave has the right to monetize and put terms of service on that output. This is a sleight of hand. The output of Brave's API is not an abstract search result. It is the verbatim or near verbatim text of copyrighted articles from publishers' websites copied without authorization and sold to Brave's commercial customers, most critically, for use in the RAG that powers most consumer-facing AI products. A traditional search engine output is a link that directs the user to the publisher's website. Brave's Data for AI API output is the copyrighted content itself — a direct substitute for licensing from the publisher.

## BRAVE SEES ITS FORTUNES RISE BY SELLING STOLEN CONTENT

42.     The economics of Brave's Data for AI business model are straightforward — and parasitic. Brave has inserted itself between publishers and the AI companies that want their content, monetizing the work of journalists without compensating those who created it. The more content Brave copies and sells, the more revenue it generates, and the less incentive AI companies have to negotiate licenses with the publishers who produced the content. Brave profits while publishers are cut out.

43.     The reason AI companies purchase Counterclaimants' copyrighted content from Brave is not difficult to understand. Generative AI companies need access to high-quality, factually accurate, up-to-date content to train and operate their models. And the most valuable content is original journalism, the

very content that publishers like Counterclaimants invest millions of dollars each year to produce. Brave offered and continues to offer a shortcut: verbatim excerpts of that journalism, delivered through its API, at prices as low as $5 per thousand queries. What Brave calls "affordable, transparent pricing" is a cut-rate price for content that Brave does not own, did not create, and has no right to sell. Brave's margins on this product are extraordinary precisely because it bears none of the underlying costs: no reporters, no editors, no newsrooms, no investigative teams, no foreign bureaus, and no fact-checking. It simply copies the finished product and resells it.

44. Brave's scheme solved a problem it had been unable to solve in any other way. For years, Brave struggled to build a profitable business. Its browser, launched in 2016, grew modestly but never threatened its major competitors. By early 2023, Brave's browser had approximately 57 million monthly active users,[8] a fraction of the billions who use Chrome, Safari, or Edge. Revenue from its Basic Attention Token cryptocurrency and ad sales reached only an estimated $20 million in 2022 and $26 million in 2023.[9] Browser user growth was flattening, and its consumer-facing search product generated little direct revenue.

45. Then came the Data for AI Search API, and with it, a dramatic reversal of fortune. Reselling stolen copyrighted content is apparently much more profitable than merely assisting consumers searching for it. By 2025, reports indicated that Brave's annualized revenue had reached approximately $100 million,[10] roughly quadrupling the company's revenues from just two years earlier. Upon information and belief, this revenue surge was not the product of a breakthrough in browser technology or a surge in consumer search traffic; rather, it was driven by the sale of publisher content to AI companies at cut-rate prices. In a February 2026 blog post, Brave announced that its Search API had experienced "exponential growth," with

---

[8] *Brave Browser Statistics by Users, Revenue, Market Share And Trends*, Electro IQ (Oct. 22, 2025), https://electroiq.com/stats/brave-browser-statistics/.

[9] *Brave Revenue, Valuation & Funding*, Sacra (last visited July 21, 2026), https://sacra.com/c/brave/.

[10] *Little-Known Search Browser Startup Generating $100 Million Annualized Revenue*, THE INFORMATION: AI AGENDA (July 21, 2026), https://www.theinformation.com/newsletters/ai-agenda/little-known-search-browser-startup-generating-100-million-annualized revenue?__cf_chl_rt_tk=zxoo5Qqicyb15KWElpvS.kzfGU69TjhNnI4NdmGP1eU-1781380593-1.0.1.1-w22dO4hCRJ1qVASjgubeJA0n4npDrHKU0.VKSXuwnIc.

DEFENDANTS' ANSWER AND COUNTERCLAIMS
CASE NO. 4:26-cv-04758-JST

"billions of weekly API calls" and "thousands of new users signing up each day."[11] Brave boasted that its API "now supplies most of the top-10 LLMs with real-time Web search data" and that "for some of those LLMs Brave is the only search engine index supporting their AI answers."[12]

46.    Brave built a highly profitable business not through innovation, but, as it has done before, by taking without permission what publishers spent millions to create and selling it to the very companies those publishers could otherwise do business with.

### a.  News Corp's Cease and Desist and Brave's Litigation History

47.    On February 27, 2025, News Corp sent Brave's founder and CEO, Brendan Eich, a cease-and-desist letter outlining how Brave was harming News Corp and other publishers: masking its web crawlers, copying copyrighted articles into its search index, and selling verbatim "Extra-alternate Snippets" and Summarizer versions of those articles to generative AI companies, including Perplexity, Cohere, and Mistral, in direct competition with News Corp's own licensing and monetization programs and to consumers in direct competition with Counterclaimants' websites and subscriptions. News Corp demanded that Brave cease its unauthorized use of News Corp content and respond within fourteen days.

48.    Brave did not respond. Instead, just 13 days later, it filed a preemptive lawsuit seeking a declaratory judgment that its conduct was lawful. On information and belief, at the same time, Brave temporarily began to block (or "deindex") from its search results any domain it had identified as belonging to the News Corp Companies. But Brave has never committed to completely stop copying all News Corp Companies' content, wherever it is found. Nor has it committed to permanently (without Court order) stop crawling and scraping News Corp Companies' websites. Nor, on information and belief, has Brave temporarily stopped surreptitiously crawling and copying copyrighted content from any other publishers. There is, in short, no reason to believe that Brave's apparent temporary suspension of its crawling and copying News Corp Companies' sites is anything other than an attempt to limit its ongoing damages for

---

[11] Brave, *The Brave Search API Shows Exponential Growth, Emerging as the Best Search Tool to Power AI Apps*, Brave: Blog (Feb. 24, 2026), https://brave.com/blog/search-api-growth.
[12] *Id.*

DEFENDANTS' ANSWER AND COUNTERCLAIMS
CASE NO. 4:26-cv-04758-JST

copyright infringement while it litigates its claim that it has the right to copy and sell Counterclaimants' copyrighted works.

49.   In June 2025, Defendants agreed to dismiss Brave's first lawsuit without prejudice to allow the parties to negotiate a mutually acceptable market-based agreement. Defendants believed they had a deal, having negotiated with Brave in good faith for nearly a year, consistent with their long-established willingness to license their copyrighted content on reasonable terms. But Brave walked away. On May 19, 2026, again without any prior notice, Brave filed this action, once again falsely claiming that Defendants are "target[ing] Brave's core, traditional search engine product." Complaint, ¶5. Counterclaimants now seek relief for past damages and future injunctive relief to shut down Brave's unlicensed, illegal and parasitic business lines.

50.   On information and belief, beginning on or around March 2025, in order to attempt to reduce the massive damages for which it is liable, Brave temporarily suspended scraping and copying from websites owned by Counterclaimants, but, on information and belief, Brave did not stop scraping Counterclaimants' copyrighted works from everywhere they can be found on the web. With respect to each of the counterclaims asserted below, Counterclaimants seek damages for the period when Brave scraped Counterclaimants' copyrighted works from their websites and illegally used them. For the period of time after March 2025, Counterclaimants seek both injunctive relief to prohibit Brave or any entity with which it contracts from copying Counterclaimants' copyrighted works for illegal purposes (wherever that content is found), together with additional damages for any illegal copying of Counterclaimants' copyrighted works that Brave has continued to copy and use illegally.

**Count One: Copyright Infringement (17 U.S.C. § 106) (Brave's Copying of Counterclaimants' Copyrighted Works to Create Inputs for its B2B API Products)**

51.   Counterclaimants repeat each and every allegation set forth above as if fully set forth herein.

52.   Counterclaimants hold exclusive rights to the extensive body of copyrighted material they seek to protect in this case.

53.    This includes copyrights in The Wall Street Journal, which Counterclaimant Dow Jones has registered with the U.S. Copyright Office, including the non-exhaustive list of Copyright Registrations attached as Appendix A and Appendix C.

54.    This further includes copyrights in the New York Post, which Counterclaimant NYP Holdings has registered with the U.S. Copyright Office, including, the non-exhaustive list of Copyright Registrations attached as Appendix B and Appendix D.

55.    Upon information and belief, Brave, without Counterclaimants' authorization, directly or indirectly through a third party, has willfully copied as many of these articles that it has been able to access with web crawlers as inputs into its B2B API products like Search API, including content covered by the registrations listed at Appendix A, Appendix B, Appendix C and Appendix D.

56.    Upon information and belief, Brave, without Counterclaimants' authorization, includes that copyrighted content into a search index that Brave licenses and sells to third parties including via its B2B API products.

57.    Upon information and belief, the copies that Brave made as inputs into Brave's B2B API product are distinct copyright violations.

58.    Every instance in which Brave, on its own or by directing or controlling a third party, copies Counterclaimants' protected work in the process of creating its B2B API products like Search API constitutes a separate violation of the Copyright Act, 17 U.S.C. § 106.

59.    As a direct and proximate result of Brave's infringements, Counterclaimants have sustained and will continue to sustain substantial, immediate, and irreparable injury for which there is no adequate remedy at law. Counterclaimants are therefore entitled to permanent injunctive relief, including, but not limited to restraining and enjoining Brave's ongoing infringement and destruction of any database or index that cannot be shown to have fully and permanently deleted Counterclaimants' copyrighted works.

60.    Counterclaimants are further entitled to recover statutory damages, actual damages, restitution of profits, attorneys' fees, and other remedies provided by law.

**Count Two: Copyright Infringement (17 U.S.C. § 106) (Brave's Copying of Counterclaimants'**

**Protected Works to Generate "Outputs")**

61.     Counterclaimants repeat each and every allegation set forth above as if fully set forth herein.

62.     Counterclaimants hold exclusive rights to the extensive body of copyrighted material they seek to protect in this case.

63.     This includes copyrights in The Wall Street Journal, which Counterclaimant Dow Jones has registered with the U.S. Copyright Office, including the non-exhaustive list of Copyright Registrations attached as Appendix A and Appendix C.

64.     This further includes copyrights in the New York Post, which Counterclaimant NYP Holdings has registered with the U.S. Copyright Office, including, the non-exhaustive list of Copyright Registrations attached as Appendix B and Appendix D.

65.     At least prior to February 2025, Brave utilized Counterclaimants' copyrighted content to sell to third parties its B2B API products, including through its Search API "Extra-alternate Snippets" or "Summarizer" versions of scraped content. The output of Brave's API is not an abstract search result. It is the verbatim or near verbatim text of copyrighted articles copied from publishers' websites without authorization and sold to Brave's commercial customers in direct competition with Counterclaimants.

66.     The Extra-alternate Snippets and Summarizer version outputs contain and/or are derived from Counterclaimants' copyrighted content, whether they come in the form of verbatim or near verbatim reproductions of Counterclaimants' copyrighted works, summaries, abridgements, or any other reproduced or derivative content sourced from Counterclaimants' copyrighted works, all of which infringe on Counterclaimants' copyrighted articles.

67.     Every instance in which Brave, on its own or by directing or controlling a third party, copies Counterclaimants' protected work to generate its Extra-alternate Snippets and Summarizer versions constitutes a separate violation of the Copyright Act, 17 U.S.C. § 106.

68.     As a direct and proximate result of Brave's infringements, Counterclaimants' ability to monetize their high-value copyrighted news articles is harmed by Brave's B2B API products including but

DEFENDANTS' ANSWER AND COUNTERCLAIMS
CASE NO. 4:26-cv-04758-JST

not necessarily limited to Extra-alternate Snippets and Summarizer version outputs derived directly from Brave's unauthorized and surreptitious copying of Counterclaimants' copyright works.

69.     Counterclaimants have sustained and will continue to sustain substantial, immediate, and irreparable injury for which there is no adequate remedy at law. Counterclaimants are therefore entitled to permanent injunctive relief, including, but not limited to restraining and enjoining Brave's ongoing infringement and destruction of any database or index that cannot be shown to have fully and permanently deleted Counterclaimants' copyrighted works.

70.     Counterclaimants are further entitled to recover statutory damages, actual damages, restitution of profits, attorneys' fees, and other remedies provided by law.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaimants respectfully request judgments against Brave as follows:

A.     Enjoining Brave from the unlawful copying of Counterclaimants' copyrighted content without Counterclaimants' authorization.

B.     Enjoining Brave from using any websites, indices, databases, or other tools that contain complete or excerpted portions of Counterclaimants' copyrighted works without Counterclaimants' authorization. This includes Brave's own indices, databases, and tools, as well as those belonging to any third parties.

C.     Ordering the destruction of any index or database created by Brave that contains, or that cannot be shown to have fully and permanently deleted, Counterclaimants' copyrighted works or any derivative content Brave has generated from Counterclaimants' copyrighted works, in any format.

D.     Ordering the destruction of any copies Brave has made and/or that Brave possesses of Counterclaimants' copyrighted works, and of any other derivative content Brave has generated in any format, that are in Brave's possession.

E.     Statutory damages, up to and including $150,000 for each infringement, actual damages, and Brave's profits, for each infringement including each unauthorized digital copy or other content derived from Counterclaimants' copyrighted works.

F.     An award of attorneys' fees, costs, and expenses as permitted by law.

G.      Such other and different relief that the Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Counterclaimants demand trial by jury on all issues so triable in this action.

Dated:    July 21, 2026                                      **JENNER & BLOCK LLP**

                                                By:    /s/ *Navid Bayar*
                                                       Susan J. Kohlmann (pro hac vice forthcoming)
                                                       Alison Stein (pro hac vice forthcoming)
                                                       Navid C. Bayar (SBN 319640)

                                                       **TORRIDON LAW PLLC**

                                                        /s/ *Paul Cappuccio*
                                                       Paul T. Cappuccio (pro hac vice forthcoming)
                                                       Brett Katz (pro hac vice forthcoming)
                                                       Justin M. Romeo (pro hac vice forthcoming)

                                                       *Attorneys for Defendants News Corporation, Dow Jones, and NYP Holdings*